IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

MICHAEL C. MCINTYRE and CAROL G.
MCINTYRE,

               Plaintiffs,

      v.

MARRIOTT INTERNATIONAL, INC.,
MARRIOTT OWNERSHIP RESORTS,
INC., and MARRIOTT RESORTS TITLE
COMPANY, INC.,

               Defendants.

                             /

CASE NO.: 502013CA 847 mB

CLASS REPRESENTATION/
CLASS ACTION

JURY TRIAL DEMANDED

## CLASS ACTION COMPLAINT

Plaintiffs Michael C. McIntyre and Carol G. McIntyre, by their undersigned attorneys, bring this class action complaint against Marriott International, Inc. ("Marriott"), Marriott Ownership Resorts, Inc. ("MORI"), and Marriott Resorts Title Company, Inc. ("Marriott Title") (collectively the "Marriott Defendants"). Plaintiffs' allegations are based upon knowledge as to their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief is based upon, among other things, investigation undertaken by their attorneys.

## NATURE OF THE ACTION

1.     This is a class action against the abovementioned Defendants for violations of the Florida Unfair Trade Practices Act ("FDUTPA"), §§ 501.201, Fla. Stats., *et seq.*, violations of the Florida Vacation and Timeshare Act, §§ 721.01, Fla. Stats., *et seq.*, ("FVTA"), and unjust enrichment. Plaintiffs and members of the class they seek to represent are all current or past owners of timeshare interests at MORI-owned timeshare properties in the State of Florida who,

upon representations that title insurance was a necessary and required component of a timeshare purchase, obtained First American Title Insurance Company policies on their timeshare purchases through Marriott Title.

2.       As alleged herein, the Marriott Defendants have, and continue to, take advantage of their unwitting consumers, including Plaintiffs and members of the proposed class, to a grossly unfair degree by, *inter alia*, representing that title insurance is a necessary and required component of a timeshare purchase, despite the transfer of a Special Warranty Deed from the developer/guarantor, MORI, to the Plaintiffs, rendering the title insurance policy useless.

3.       Although the Marriott Defendants require title insurance for each and every timeshare purchase, the Special Warranty Deed conveyed to Plaintiffs and members of the proposed class guarantees that the conveyance is free of all liens, claims, and encumbrances not on record at the time of conveyance. Likewise, the title insurance policies obtained by Plaintiffs and members of the proposed class insure title to the timeshare interest against all liens, claims, and encumbrances not on record at the time of conveyance.

4.       Given the redundant nature of the protections conveyed by the Special Warranty Deed and the title insurance policies obtained, Plaintiffs and members of the class cannot be presented with an opportunity to utilize the title insurance policy, despite being required by the Marriot Defendants to purchase the same.

5.       Plaintiffs, on their own behalf and as representatives of the class, seek to recover compensatory damages in the amount of the purchase price of the title insurance policies purchased due to the Marriott Defendants' representations.

6.       In addition, Plaintiffs seek injunctive relief, including, but not limited to an order directing: (a) cessation of the wrongful and deceptive practices; (b) implementation of

- 2 -

administrative changes designed to remedy current and future problems; and (c) improved disclosure to current and prospective timeshare purchasers.

## JURISDICTION AND VENUE

7.    This is an action for damages exceeding Fifteen Thousand Dollars ($15,000.00) exclusive of attorney fees and costs.

8.    This Court has personal jurisdiction over the Plaintiffs because they submit to the jurisdiction of the Court.

9.    This Court has personal jurisdiction over Marriott because it regularly transacts business within the State of Florida through its wholly-owned subsidiary MORI.

10.    This Court has personal jurisdiction over MORI because it is headquartered in the State of Florida, transacts business within the State of Florida, and by virtue of the fact that MORI's executive offices are located in the State, MORI systematically and continually conducts business throughout the State.

11.    This Court has personal jurisdiction over Marriott Title because it is incorporated under the laws of Florida, transacts business within the State of Florida, and by virtue of the fact that Marriott Title's executive offices are located in the State, Marriott Title systematically and continually conducts business throughout the State.

12.    Venue is proper because the Amendment to Contract for Purchase (attached hereto as Exhibit A) stipulates that all disputes regarding the same shall be governed by the laws of the State of Florida and the venue shall be in Palm Beach County, Florida.

## PARTIES

13.    Plaintiffs Michael C. McIntyre and Carol G. McIntyre are husband and wife and are residents of New Jersey. Plaintiffs have purchased several timeshare properties from MORI,

- 3 -

namely a March 3, 2009 purchase of a timeshare interest at Oceana Palms - a MORI-owned condominium resort located in the State of Florida. Plaintiffs financed the purchase amount of $38,900.00 and were required by MORI to purchase title insurance on that timeshare interest.

14.    Defendant Marriott International, Inc. ("Marriott") is a Delaware corporation with its headquarters at 10400 Fernwood Road, Bethesda, Maryland, 20817. According to its website, Marriott employed approximately 137,000 individuals and reported nearly $11 billion in sales from continuing operations during the 2009 fiscal year. In the first quarter of 2012, Marriott reported a net income totaling $104 million. Marriott holds more than 3,400 lodging properties in 68 countries and territories, and operates and franchises hotels under the brand names: Marriott, JW Marriott, The Ritz-Carlton, Renaissance, Edition, AC Hotels, Residence Inn, Courtyard, TownePlace Suites, Fairfield Inn, Spring Hill Suites, Autograph Collection, and Bulgari. In addition to Marriott's hotel operations, Marriott also licenses and manages the whole-ownership residential brands The Ritz-Carlton Residences, JW Marriott Residences, and Marriott Residences; operates the Marriott Executive Apartments brand; operates the Marriott ExecuStay brand providing furnished corporate housing; and operates conference centers. Among its numerous operations, Marriott also develops and operates vacation ownership resorts under the brand names: Marriott Vacation Club, The Ritz-Carlton Destination Club, and the Grand Residences by Marriott. Marriott manages its domestic vacation ownership, or timeshare, properties through its wholly-owned subsidiary, Defendant Marriott Ownership Resorts, Inc., d/b/a Marriott Vacation Club International.

15.    Defendant Marriott Ownership Resorts, Inc., d/b/a Marriott Vacation Club International ("MORI") is a Delaware corporation and wholly-owned subsidiary of Defendant Marriott International, Inc. MORI maintains its principle place of business at 6649 Westwood

Boulevard – Suite #500, Orlando, Florida, 32821. MORI is responsible for managing Marriott's domestic timeshare operations. MORI develops and owns Marriott's domestic timeshare properties and sells timeshare interests in those properties to Plaintiffs and members of the Class.

16.     Defendant Marriott Resorts Title Company, Inc. ("Marriott Title") is a Florida corporation and wholly-owned subsidiary of Defendant MORI. Marriott Title's principle place of business is located at 6649 Westwood Boulevard – Suite #500, Orlando, Florida, 32821. Although MORI does not expressly require the use of Marriott Title as closing agent for a MORI timeshare purchase, Marriott Title acts as the closing agent unless the purchaser expressly requests otherwise.

## CLASS REPRESENTATION/CLASS ACTION ALLEGATIONS

17.     Plaintiffs bring this class action on their behalf and on the behalf of all similarly situated MORI timeshare purchasers who, financed the purchase of a MORI timeshare interest in the State of Florida and who purchased title insurance on that timeshare interest from December 28, 2008 through the present.

18.     Plaintiffs, by virtue of their experiences and damages suffered as MORI timeshare purchasers, are representatives of the Class.

19.     This action is properly maintainable as a class action.

20.     The class is so numerous that joinder of all members is impracticable.

21.     The number and identity of class members can be easily determined from the records maintained by the Marriott Defendants and/or their agents. The disposition of their claims in a class action will be of benefit to the parties and to the Court.

22.     A class action is superior to other methods for the fair and efficient adjudication of the claims herein asserted, and no unusual difficulties are likely to be encountered in the

management of this action as a class action. The likelihood of individual class members prosecuting separate claims is remote.

      23.     There is a well-defined community of interest in the questions of law and fact involved affecting members of the Class. Among the questions of law and fact which are common to the Class, and which predominate over questions affecting individual class members are the following:

          a.  Whether the Marriott Defendants violated the Florida Deceptive and Unfair Trade Practices Act by representing title insurance as a necessary and required component of a timeshare purchase;

          b.  Whether the Marriott Defendants violated the Florida Vacation and Timeshare Act by misrepresenting the necessary nature of a title insurance policy and the quality of the Special Warranty Deed conveyed;

          c.  Whether the Marriott Defendants breached common law covenants with Plaintiffs and members of the Class by, *inter alia*, representing that title insurance was necessary and requiring the same for a timeshare purchase; and

          d.  Whether, and to what extent, Plaintiffs and members of the Class have been damaged by the Marriott Defendants' conduct and the proper measure of damages.

      24.     Plaintiffs are members of the Class and are committed to prosecuting this action. Plaintiffs have retained competent counsel experienced in litigation of this nature. Plaintiffs' claims are typical of the claims of other members of the Class in that they are seeking compensatory damages for the Marriott Defendants' conduct as alleged herein, the same claims

being asserted on behalf of each individual member of the respective class. Plaintiffs are, therefore, adequate representative of the Class as described herein.

25.    The likelihood of individual Class members prosecuting separate individual actions is remote due to the relatively small loss suffered by each Class member as compared to the burden and expense of prosecuting litigation of this nature and magnitude. Absent a class action, the Marriott Defendants are likely to avoid liability for their wrongdoing, and the members of the class are unlikely to obtain redress for the wrongs alleged herein.

26.    Adjudication of this case on a class-wide basis is manageable by this Court. The contracts that were entered into by Plaintiffs and each Class member through the State of Florida are the same or so similar as to be legally and factually indistinguishable in all material respects, and under the terms of the said contracts, Florida law is to be applied to disputes arising thereunder. As a result, it will not be difficult for the Court or the jury to determine whether the Marriott Defendants have violated FDUTPA, FVTA, and the common law. This Court is an appropriate forum for this dispute.

## FACUTAL ALLEGATIONS

27.    As described above, Marriott is a dominant player in the timeshare industry, managing over 10,000 timeshare units.    Marriott's wholly-owned subsidiary, MORI, is responsible for Marriott's domestic timeshare operations and is the entity that owned and sold the timeshare interest to Plaintiffs. Marriott Title, MORI's wholly-owned subsidiary, purported to act as Plaintiffs' closing agent to procure Plaintiffs' title insurance from First American Title Insurance Company.

28.     Plaintiffs purchased a Marriott timeshare, located at Oceana Palms, a MORI-owned condominium resort located at 3200 N. Ocean Dr., Riviera Beach, Florida 33404 (the "Timeshare") on March 3, 2009.

29.     When purchasing the Timeshare, the Marriott Defendants required that Plaintiffs procure title insurance in order for Plaintiffs to purchase the Timeshare itself and to receive the benefits of participation in Marriott's "Timeshare/Marriott Rewards Program."

30.     Representations regarding the necessary and required nature of title insurance for the Timeshare were made during the sales presentations regarding the purchase of the Timeshare and the procedures that would follow through closing.  The presentations, delivered by representatives of the Marriott Defendants, are substantially similar or identical to those made to all other purchasers of a Marriott timeshare property, including members of the proposed Class.

31.     In addition to the verbal representations made by the Marriott Defendants, the Contract for Purchase between Plaintiffs and MORI further represents that title insurance is a necessary and required component in purchasing a Marriott timeshare interest.  The Contract for Purchase, substantially similar or identical to the contracts prepared for all other purchases of Marriott timeshare properties, including members of the Class, states in relevant part:

> Closing costs associated with the purchase, financing and conveyance of a timeshare estate, include, but are not limited to: cost of recording the deed, documentary stamp tax on the deed, *title insurance premiums*, document preparation fees, costs or recording the purchase money mortgage (if any), any sales tax on the aforedescribed Common Furnishings Interest, and applicable intangible and documentary stamp taxes on the recording purchase money mortgage (if any).

A copy of the Contract for Purchase is annexed hereto as Exhibit A (emphasis added).

32.   In obtaining the required title insurance, Plaintiffs did not expressly request the use of another closing agent; therefore, Marriott Title acted as closing agent as per the Contract for Purchase, which states:

> [Marriott Title] shall act as closing agent, unless Purchaser requests a different closing agent, in which case Purchaser shall pay any increased closing costs as set forth under Paragraph III (front) in connection with using such closing agent.

*Id.*

33.   By acting as closing agent, Marriott Title received a financial benefit in the form of fees collected from Plaintiffs. The collected fees, in turn, benefit MORI as owner of Marriott Title, which then benefits Marriott as owner of MORI.

34.   The Contract for Purchase provides that MORI is the developer, owner, and seller of the Timeshare. Further, the Contract for Purchase provides that MORI shall convey title under a Special Warranty Deed, free and clear of all liens, claims, and encumbrances that are not of record at the time of closing. The Contract for Purchase reads:

> Deliver to Purchaser its special warranty deed conveying title to the Timeshare Estate(s) purchased free and clear of all liens, claims, and encumbrances, except Purchaser's mortgage (if any), the terms and conditions of the Declaration, conditions, restrictions, covenants, reservations, limitations, zoning, and easements of record at the time of closing, taxes for the then current and subsequent years and liens created by actions of the Purchaser.

*Id.*

35.   As expressed in the Contract for Purchase, the Special Warranty Deed stipulates:

> The Grantor [MORI] fully warrants the title to said land, and will defend the same against the lawful claims of all persons claiming by, through or under said Grantor.

A copy of the Special Warranty Deed in annexed hereto as <u>Exhibit B</u>.

- 9 -

36.     Title insurance in necessitated by the danger that a lien, claim, or encumbrance against a newly purchased property may surface despite a clear record check.  As such, a representation that title insurance is a necessary and required component of a timeshare purchase indicates that such a lien, claim, or encumbrance may indeed one day surface.

37.     Despite the Marriott Defendants' representations that title insurance is a necessary component in a MORI timeshare purchase, the quality of the Special Warranty Deed renders Plaintiffs' title insurance policy useless.  Under the Special Warranty Deed, MORI guarantees that title to the timeshare interest is free of all liens, claims, or encumbrances not on record at the time of conveyance.  Likewise, title insurance guarantees the title against all liens, claims, or encumbrances not on record at the time of conveyance.  Therefore, upon conveyance of a Special Warranty Deed, MORI guarantees the title as free of any and all liens, claims, and encumbrances that are not on record at the time of conveyance while simultaneously requiring Plaintiffs and members of the Class to purchase a title insurance policy providing the same protections.

38.     Given that both the title insurance policy and the Special Warranty Deed guarantee the title against all liens, claims, and encumbrances not on record at the time of conveyance, the only opportunity presented to Plaintiffs and members of the Class to utilize said policy is predicated by the Marriott Defendants' failure to provide the guarantees in the Special Warranty Deed.  As such, the Marriot Defendants required Plaintiffs and members of the Class to purchase, often through Marriott Title, an insurance policy that replicates the protections conveyed in the Special Warranty Deed.  Given the identical protections afforded by both the title insurance policy and the Special Warranty Deed, title insurance is in fact unnecessary when purchasing a MORI timeshare interest.  Rather, the policy is entirely useless to Plaintiffs and members of the Class.

- 10 -

## COUNT I

### *Florida Deceptive and Unfair Trade Practices Act*

39.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

40.     Plaintiffs and Class members are "consumers" as defined by Florida Statute §501.203(7), and the subject transactions are "trade or commerce" as defined by Florida Statute §501.203(8).

41.     FDUPTA was enacted to protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

42.     The Marriott Defendants falsely represented to Plaintiffs and members of the Class that title insurance was a necessary and required component of a timeshare purchase.  Such representations were likely to mislead a reasonable consumer, and in making them, the Marriott Defendants have materially misled Plaintiffs and members of the Class.

43.     Further, the Marriott Defendants' representations and omissions of material facts regarding the necessity of title insurance directly harmed Plaintiffs and members of the Class.

44.     Said misrepresentations and omissions were made during sales presentations and through written materials provided to Plaintiffs and members of the Class when purchasing a timeshare interest from MORI.

45.     The Marriott Defendants' misrepresentations and omissions constitute violations of FUDTPA, § 501.204(1), Fla. Stats., which prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce...."

46.     Due to the unnecessary and ultimately useless nature of title insurance on the Timeshare purchase, the Marriott Defendants' representations constitute unfair or deceptive actions resulting in a violation of FDUTPA.

47.     Plaintiffs and the Class have been damaged as a result of Defendants violations of FDUTPA in that they incurred the costs for the useless title insurance.

48.     As a direct and proximate result of the unconscionable, unfair, and deceptive acts or practices alleged herein, Plaintiffs and the Class members have been damaged and are entitled to recover actual damages to the extent permitted by law, including class action rules, in an amount to be proven at trial.  In addition, Plaintiffs and the Class seek equitable relief and to enjoin Defendants on the terms that the Court considers reasonable, and reasonable attorneys' fees.

## COUNT II

### *Florida Vacation and Timeshare Act*

49.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth in paragraphs 1 - 38 above as though fully set forth herein.

50.     In making oral representations that title insurance is a necessary and required component of the Timeshare purchase, the Marriott Defendants violated section 721.11(4)(a), Florida Statutes, by misrepresenting both the necessity of title insurance and the quality of the Special Warranty Deed.

51.     The Florida Vacation and Timeshare Act, § 721.11(4)(a), Fla. Stats., provides: "No advertising or oral statements made by any seller or resale service provider shall: ... [m]isrepresent a fact or create a false or misleading impression regarding the timeshare plan or promotion thereof."

- 12 -

52.    The Special Warranty Deed guarantees the conveyed title is free and clear of all liens, claims, or encumbrances not on record at the time of conveyance; therefore, any representations that title insurance is necessary are false. Further, title insurance protects title from any liens, claims, or encumbrances not on record at the time of conveyance; therefore, by representing that title insurance is necessary, the Marriott Defendants misrepresent the quality of the Special Warranty Deed.

53.    As a direct and proximate result of the Marriot Defendants' material misrepresentations concerning the necessary and required nature of title insurance, Plaintiffs and members of the Class have and will continue to suffer damages.

## COUNT III

### *Unjust Enrichment*

54.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth in paragraphs 1 - 38 above as though fully set forth herein.

55.    Plaintiffs and the Class conferred a benefit on the Marriott Defendants by paying premiums and fees for the useless title insurance.

56.    The Marriott Defendants have and continue knowingly to benefit by wrongfully charging premiums and fees, which, in all instances where Marriott Title is the closing agent, are collected to the benefit of Marriott Title, thereby benefiting MORI and Marriott.

57.    As a direct and proximate result of the Marriott Defendants' conduct, Plaintiffs and members of the Class have been and continue to be deprived of the possession and use of the funds used to purchase the required title insurance. Therefore, the Marriott Defendants have been unjustly enriched.

## PRAYER FOR RELIEF

- 13 -

WHEREFORE, Plaintiffs pray for judgment and relief as follows:

A. Declaring that this lawsuit is properly maintainable as a class action, certifying Plaintiffs as representatives of the class, and appointing undersigned counsel as attorneys for the class;

B. Declaring that the Marriott Defendants violated the Florida Deceptive and Unfair Trade Practices Act;

C. Declaring that the Marriott Defendants were unjustly enriched by their conduct;

D. Awarding compensatory damages against the Marriott Defendants in an amount to be determined at trial, together with prejudgment interest at the maximum rate allowable by law;

E. Ordering injunctive relief, including permanently enjoining and restraining the Marriott Defendants from engaging in the wrongful and deceptive practices complained of herein and ordering full disclosure of Defendants' actual practices, and the entry of such other orders as may be necessary or appropriate to restore to Plaintiffs and members of the Class, money acquired in violation of the FDTUPA.

F. Awarding Plaintiffs and members of the Class their costs and disbursements and reasonable allowances for Plaintiffs' counsel and experts' fees and expenses; and

G. Granting such other and further relief as may be just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury of all issues so triable.

Dated: January 7th, 2013

Respectfully submitted,

J. Andrew Meyer, Esq.
Florida Bar No. 0056766
**MORGAN & MORGAN, P.A.**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: (813) 223-5505
Facsimile: (813) 223-5402
Primary email: ameyer@forthepeople.com
Secondary email: ldesouza@forthepeople.com

**NEWMAN FERRARA LLP**
Jeffrey M. Norton
1250 Broadway, 27th Floor
New York, New York 10001
Telephone: (212) 619-5400
Facsimile:   (212) 619-3090
jnorton@nfllp.com

*Attorneys for Plaintiffs*

- 15 -

## AMENDMENT TO CONTRACT FOR PURCHASE

This AMENDMENT is to that certain Contract for Purchase dated the 3RD day of MARCH, 2009, and is entered into by and between MICHAEL C. MCINTYRE & CAROL G. MCINTYRE (Purchaser(s) and MARRIOTT OWNERSHIP RESORTS, INC., (Seller) this 3RD day of MARCH, 2009 .

1.  The Contract for Purchase for Unit(s) SN*1122 Week(s) 04 at MARRIOTT'S OCEANA PALMS dated MARCH 3, 2009, executed by and between the undersigned parties is hereby incorporated by reference as if fully set forth herein and each of the terms and conditions thereof shall remain in full force and effect unless specifically modified herein. In the case of conflict between the Contract for Purchase and this Amendment, the Amendment shall control.

2.  The additional deleted and/or modified terms of the afore-described Contract for Purchase are set forth hereunder as follows:

    The above purchaser(s) have exercised an option to purchase Alternate Usage in lieu of 2009 occupancy in the PLATINUM Season for 1 week at a cost of $1,095.00 per unit week, to be paid at point of sale. Total Alternate Usage fees will be $1,095.00 in exchange for a total of 110,000 Marriott Rewards[SM] points. Points will be credited to purchaser MR membership account at close of contract. All program rules, regulations and redemption guidelines for Marriott Rewards[SM] will apply. This Alternate Usage option is not to be considered part of the first day purchase incentive.

All other terms and conditions of the original contract will remain in full force and effect.

PURCHASER(S):                      DATED:

_Michael C. McIntyre_              3/3/09
MICHAEL C. MCINTYRE

_Carol G. McIntyre_                3/3/09
CAROL G. MCINTYRE

SALES EXECUTIVE:          SELLER:
                          MARRIOTT OWNERSHIP RESORTS, INC.

DON RABY                   _____        3/3/09



EXHIBIT

A

Pre-Construction TAPP

**OCEANA PALMS CONDOMINIUM**
**CONTRACT FOR PURCHASE**

Developer/Owner/Seller: Marriott Ownership Resorts, Inc., P.O. Box 890, Lakeland, Florida 33802 Attn: Director of New Owner Administration
Purchaser(s):MICHAEL C. & CAROL G. MCINTYRE, 2592 COLLIER ROAD, MANASQUAN, NJ 08736 (H) 732-223-7252 *DNC* (B) - -    *DNC*, with title taken as
MICHAEL C. MCINTYRE AND CAROL G. MCINTYRE, Tenants by Entireties

I. **PROPERTY; OCCUPANCY; PURCHASE PRICE PER TIMESHARE ESTATE.** Marriott Ownership Resorts, Inc., a Delaware corporation, (hereinafter referred to as "Seller") agrees to sell and the aforedescribed Purchaser or Purchaser(s) (hereinafter referred to as "Purchaser") agrees to purchase, the following described timeshare estate(s) in Oceana Palms Condominium ("Condominium") located at 3200 North Ocean Drive, Riviera Beach, Florida 33404 upon the following terms and conditions:

| Season | Unit No./Unit Week | View Type: | Occ. may commence in | Purchase Price: |
|--------|--------------------|------------|----------------------|------------------|
| Platinum | 1122 04 | 2Bdrm/OV | 2010 | $ 38,900.00 |

("Timeshare Estate(s)") according to the Declaration of Condominium thereof recorded in Official Records Book 22467 at Page 175 in the Public Records of Palm Beach County, Florida, and any amendments thereto (as amended, the "Declaration").
*NOTE: Purchaser should refer to Paragraph I below concerning occupancy periods.

Seller further agrees to cause Marriott Ownership Resorts Procurement, L.L.C., a Delaware limited liability company ("MORP"), to procure the furniture, appliances and equipment (the "Common Furnishings") for the Unit to which the subject Timeshare Estate(s) is appurtenant and to furnish such Unit with said Common Furnishings. The "Purchase Price" as listed under Item II. ("Purchase Price and Terms") below, includes a charge of ( 2.25 %) of the Purchase Price representing the retail value of the subject Common Furnishings.

Seller further agrees to cause MORP to procure the Common Furnishings for the Unit which is referenced in the Deed by which the Timeshare Estate(s) is being conveyed to you, and to furnish such Unit with said Common Furnishings. If the Unit to which the Timeshare Estate(s) is appurtenant is a Unit in which Seller will be conveying a timeshare estate to the Association such that an accompanying Use Period may be set aside by the Association for maintenance purposes, MORP hereby sells an undivided 1/51st interest in the subject Common Furnishings for each such Timeshare Estate so conveyed to Purchaser, and Purchaser hereby concurrently conveys such undivided interest to the Association. If the Unit is not such a Unit, MORP hereby sells an undivided 1/52nd interest in the subject Common Furnishings for each such Timeshare Estate so conveyed to Purchaser, and Purchaser hereby concurrently conveys such undivided interest to the Association. The undivided interest in the subject Common Furnishings described in this paragraph shall hereinafter be referred to as "Common Furnishings Interest."

II. **PURCHASE PRICE AND TERMS.** The combined total Purchase Price ("Purchase Price") of the Timeshare Estate(s) (97.75%) and the Common Furnishing Interest(s) (2.25 %) payable in good U.S. funds is as follows:.....................................................................................................

| | |
|---|---|
| a. Closing Costs.............................................................................................................................. | $      38,900.00 |
| b. Reservation Deposit (if any)...................................................................................................... | $       1,161.91 |
| c. Deposit (received on date of execution of this Contract):............................................................. | |
| d. Additional Deposit (due by ):................................................................................................... | $       3,890.00 |
| e. Seller-financing (if applicable)................................................................................................... | |
| f. Balance of Purchase Price, including closing costs, payable at closing............................................ | $      36,171.91 |
| | $           0.00 |

The balance of the Purchase Price shall be paid at closing (in cash, cashier's check, or certified check) or by the proceeds of a loan requested by Purchaser in the amount of the balance due. If Seller-financing is requested pursuant to Paragraph II(e) herein above, this Contract is contingent upon financing being made available by Seller, provided Purchaser makes a good faith effort to qualify for said financing, to include, but not limited to, supplying all required documentation requested by Seller in order to evaluate Purchaser's credit-worthiness. For Seller-financed sales, there is a monthly service fee as provided for in the loan documents.

III. **EXPENSES AT CLOSING.** Purchaser agrees to pay all closing costs which shall not exceed $ 1,161.91 or the actual closing costs, whichever is less. Seller will pay all standard closing costs in excess of the $ 1,161.91 amount, except where a different closing agent and/or title agent other than those set forth at Paragraphs 5 and 10 below is selected by Purchaser, in which case Purchaser will pay all closing costs, whatever they may be. Closing costs associated with the purchase, financing and conveyance of a timeshare estate, include, but are not limited to: cost of recording the deed, documentary stamp tax on the deed, title insurance premiums, document preparation fees, cost of recording the purchase money mortgage (if any), any sales tax on the aforedescribed Common Furnishings Interest, and applicable intangible and documentary stamp taxes on the purchase money mortgage (if any). In addition to closing costs, Purchaser shall pay at closing (or be billed within 30 days after closing occurs) the first year's estimated maintenance fee of $985.68 (if Purchaser has occupancy or beneficial use in the same year that closing occurs), and expenses for estimated ad valorem taxes of $520.53.

IV. **ASSESSMENTS AND OTHER EXPENSES.** From and after the closing, Purchaser shall be responsible for payment of maintenance fees for each Timeshare Estate purchased as provided in the Declaration. Purchaser shall be responsible for ad valorem taxes levied on the Timeshare Estate(s) and assessments, special assessments or special charges levied by OCEANA PALMS CONDOMINIUM ASSOCIATION, INC. ("Association"). Should additional timeshare periods be created and timeshare estates be conveyed by Developer to the Association, Purchaser agrees to pay a proportionate amount of the Association's maintenance fees.

**Purchaser should not rely on Seller's current property taxes as the amount of property taxes that Purchaser may be obligated to pay in the year subsequent to purchase. A change of ownership or property improvements triggers reassessments of the property that could result in higher property taxes. If you have any questions concerning valuation, contact the county appraiser's office for information.**

V. **CLOSING.** The estimated date of closing is within 30 days from acceptance of this Contract by Seller.

VI. **COMPLETION OF CONSTRUCTION.** The accommodations and facilities being offered are not substantially completed. The estimated date of completion of construction of the accommodations and facilities being offered is JANUARY 2010. Seller intends to construct the accommodations and facilities substantially in accordance with the plans, drawings or renderings on file with Seller. Any floor plan drawings, elevations or other schematic materials delivered to Purchaser are approximations and are not representations or agreements as to the exact floor plan or layout of the accommodations and facilities. In case of conflict between such drawings or materials and the plans and specifications, the plans and specifications shall control and govern in all respects. Seller reserves the right to change the plans and specifications if necessitated by job conditions;

Purchaser might or could do if Purchaser was personally present; and Purchaser hereby ratifies and confirms to all that said attorney shall lawfully do or cause to be done by virtue of these presents. This special power of attorney shall expire and be of no further effect upon the recordation of the special warranty deed conveying title to Purchaser. X. ADDITIONAL TERMS.  Seller to pay first year of Interval International membership fees.  Purchaser to pay ad valorem taxes.   SELLER TO PAY 2010 BY MAINTENANCE FEE. Seller to award ( 125 ,000 ) Marriott Rewards Points.  DEVELOPER/OWNER/SELLER TO DELIVER THE SALES INCENTIVE TO PURCHASER WITHIN APPROXIMATELY ONE HUNDRED AND EIGHTY (180) DAYS FOLLOWING CLOSING

Any resale of this timeshare interest must be accompanied by certain disclosures in accordance with Section 721.065, Florida Statutes.

You may cancel this Contract without any penalty or obligation within 10 calendar days after the date you sign this Contract or the date on which you receive the last of all documents required to be given to you pursuant to Section 721.07(6), Florida Statutes, whichever is later. If you decide to cancel this Contract, you must notify Seller in writing of your intent to cancel.  Your notice of cancellation shall be effective upon the date sent and shall be sent to Marriott Ownership Resorts, Inc. ATTN: Manager, Sales Administration 71 Ocean Avenue, Palm Beach Shores FL 33404.  Any attempt to obtain a waiver of your cancellation right is void and of no effect.  While you may execute all closing documents in advance, the closing, as evidenced by delivery of the deed or other document, before expiration of your 10-day cancellation period, is prohibited.*

PURCHASER(S)                                              DATE:   3/3/09        PURCHASER(S)                                     DATE
MICHAEL C. MCINTYRE
                                                          3/3/09
CAROL G. MCINTYRE

*The term "Notify" as used above means any written notice of cancellation which is delivered by any means, including certified mail return receipt requested, to the developer.

SALES EXECUTIVE:

Donald Raby

MARRIOTT OWNERSHIP RESORTS, INC.
By:                                                        Date:   3/3/09
    Authorized Representative

MARRIOTT OWNERSHIP RESORTS, PROCUREMENT, L.L.C.,
a Delaware limited liability company
By:                                                        Date:   3/3/09
    Authorized Representative

1.   TIMESHARE PLAN.  The Timeshare Plan being offered by the Developer is what is commonly referred to as "interval ownership" which is a deeded interest in real estate known as a timeshare estate consisting of a revolving estate for years through Day 1 of Unit Week 1 in the Year 2069 (unless extended pursuant to the Declaration) and a remainder estate in perpetuity as a tenant-in-common with all other Owners of timeshare estates in a given Unit. Purchaser should refer to the Public Offering Statement promulgated by the Developer pursuant to Chapter 721, Florida Statutes, (the "Public Offering Statement") for a full explanation of the Timeshare Plan being offered.  Each Unit committed to the Timeshare Plan contains fifty-two (52) timeshare periods consisting of a Unit Week each. Unit Week 1 is the seven (7) days commencing on the first Saturday (as provided in the Declaration) in a calendar year.  Unit Week 2 is the seven (7) days succeeding.  Additional weeks up to and including Unit Week 52 (or, where applicable, Unit Week 53) are computed in a like manner.  Any excess days not otherwise assigned shall be retained by Seller pursuant to the provisions of the Declaration.  However, notwithstanding the specific designation of Day 1 in this Contract, as it pertains to ownership of a timeshare estate, Day 1 for the usage of any Timeshare Estate shall be determined by the applicable Check-in Day for the Designated Week, as set forth in Section 2.13 of the Declaration, as such may be amended from time to time.  With the exception of Unit Weeks that are in the Platinum Plus Season for which the timeshare period each year is fixed (but the Check-in Day may vary), all timeshare estates sold by Seller are subject to "Floating Time" as set forth in the Declaration wherein owners of timeshare estates, although deeded a specific timeshare estate with an associated timeshare period under the Timeshare Plan, are restricted as to the period of time they can use the accommodations and facilities of the Timeshare Plan. Unit Weeks run from 10:00 a.m. on the first Saturday of the Unit Week assigned to 10:00 a.m. on the last Saturday, or such other first and last day of the Unit Week as provided for under the Reservation Procedures or the Declaration.  Occupancy of a Unit is governed by the Declaration, the Bylaws, and the Condominium Rules and Regulations, and it shall not commence until 4:00 p.m. on the first day of the timeshare period.
2.   DISCONTINUANCE OF TIMESHARE PLAN.  Notwithstanding anything contained herein to the contrary, Seller reserves the right to terminate this Contract prior to closing by refunding the deposit paid hereunder within one hundred eighty (180) days after the date the first purchaser signed a Contract to purchase a timeshare estate in the phase of the Condominium that contains the Unit described above in the event Seller does not pre-sell one hundred percent (100%) of the total number of timeshare estates contained in said phase.  Under such circumstances, Seller shall return to Purchaser all sums theretofore paid hereunder, and upon making such payment, neither party shall have any further rights, obligations, or liabilities with respect to the other party under this Contract.
3.   MODIFICATIONS AND CHANGES.  Seller reserves the right to make changes in the Declaration, provided those changes do not decrease Purchaser's share in the common elements, change his voting rights or increase his share of common expenses except as permitted by the Declaration.  Notwithstanding the foregoing, Seller may, in its sole discretion, add subsequent phases as provided in the Declaration affecting the shares of the common elements.  Each Unit shall be substantially similar to the furnished model(s) described in Exhibit A to the Declaration; however, Seller shall have the right to substitute materials, furnishings, furniture, appliances, and

Paragraph 10 below, as a precondition to receiving the return of all funds paid hereunder, Purchaser shall be obligated to convey the Timeshare Estate(s) back to Seller free from any liens and encumbrances, other than a purchase money mortgage in favor of Seller, which attached to the Timeshare Estate(s) subsequent to Purchaser's initial acquisition of title.

8. **CANCELLATION.** In the event Purchaser cancels this Contract during the 10-day cancellation period, Seller will refund to Purchaser the total amount of all payments made by Purchaser under this Contract, reduced by the proportion of any contract benefits Purchaser has actually received under this Contract prior to the effective date of the cancellation. The refund shall be made within twenty (20) days of demand therefore by Purchaser, or within five (5) days after receipt of funds from Purchaser's cleared check, whichever is later.

9. **EXCHANGE PROGRAM.** Seller has executed an agreement with Interval International, Inc. ("Interval"), which provides for a reciprocal exchange program for owners of timeshare estates. Seller, at its sole expense, has paid the Developer's application fee therefore permitting Purchaser to join the program in the future. Seller makes no representations as to Interval, and all representations set forth within the brochures and literature of Interval are representations of Interval and not of Seller. Seller will pay Purchaser's initial membership fee for the Timeshare Estate(s) purchased. Thereafter, membership in the exchange program offered by Interval, or any other exchange program, is at the option and expense of Purchaser. Although Seller has entered into a multi-year agreement with Interval, Seller has retained the right to change its exchange program affiliation at a future date.

10. **CLOSING AND TITLE.** Purchaser and Seller shall execute closing documents and deliver such documents, together with any funds required to close the transaction, to the closing agent, upon request by the closing agent. MRTC shall act as closing agent, unless Purchaser requests a different closing agent, in which case Purchaser shall pay any increased closing costs as set forth under Paragraph III (front) in connection with using such closing agent. Closing documents will either be executed at the time of execution of this Contract and held in escrow until closing when closing funds are sent, or the closing will be handled entirely by mail. Following receipt of all necessary documents by closing agent, closing shall occur as soon as possible following the later of (i) expiration of Purchaser's right of rescission without Purchaser exercising Purchaser's right to cancel as provided herein, and (ii) funds being furnished to closing agent. At closing, Seller shall deliver to Purchaser its special warranty deed conveying title to the Timeshare Estate(s) purchased free and clear of all liens, claims, and encumbrances, except Purchaser's mortgage (if any), the terms and conditions of the Declaration, conditions, restrictions, covenants, reservations, limitations, zoning, and easements of record at the time of closing, taxes for the then current and subsequent years and liens created by actions of Purchaser. If alternate assurances are obtained and approved by the Division of Florida Land Sales, Condominiums and Mobile Homes, then at Developer's election and sole discretion, the purchase of a timeshare estate may be closed prior to completion of construction of the Units and amenities contained in the phase of the Condominium in which the timeshare estate is located, as permitted by Section 721.08(5)(b), Florida Statutes.

11. **WARRANTIES.** DEVELOPER SPECIFICALLY PROVIDES THE SOLE WARRANTIES WHICH ARE LIMITED TO THOSE WARRANTIES REQUIRED BY §718.203, FLORIDA STATUTES: HOWEVER, DEVELOPER DISCLAIMS ANY AND ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE IN CONNECTION WITH THE CONSTRUCTION OF THE UNITS AND THE COMMON ELEMENTS AND WITH RESPECT TO ANY PERSONAL PROPERTY AMONG THE CONDOMINIUM PROPERTY. EACH OWNER ASSUMES ALL RISKS AND LIABILITIES IN CONNECTION WITH THE USE OF ANY OF THE AFOREMENTIONED PROPERTY.

DEVELOPER MAKES THE SOLE WARRANTIES DESCRIBED ABOVE EXPRESSLY IN LIEU OF ALL OTHER EXPRESS OR IMPLIED WARRANTIES CONCERNING THE UNIT SOLD OR TO BE CONSTRUCTED HEREUNDER AND THE CONDOMINIUM PARCEL SOLD HEREUNDER OR PREVIOUSLY PURCHASED FROM DEVELOPER, AND ANY OTHER REPRESENTATIONS, STATEMENTS OR PROMISES MADE BY ANY PERSON ARE UNAUTHORIZED AND ARE NOT BINDING UPON DEVELOPER. ALL OTHER WARRANTIES WITH RESPECT TO THE UNIT AND THE CONDOMINIUM PARCEL HEREUNDER ARE HEREBY DISCLAIMED, TO THE EXTENT PERMITTED BY LAW, WHETHER IMPLIED OR ARISING BY OPERATION OF LAW, COURSE OF DEALING, CUSTOM AND PRACTICE, OR OTHERWISE, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF HABITABILITY, MERCHANTABILITY, AND FITNESS FOR PARTICULAR PURPOSE; AND PURCHASER REPRESENTS THAT PURCHASER HAS READ AND UNDERSTANDS THIS PROVISION, AND THAT PURCHASER UNDERSTANDS AND AGREES THAT BY ENTERING INTO THIS CONTRACT AND ACCEPTING THE BENEFITS OF THE LIMITED WARRANTY DESCRIBED ABOVE, PURCHASER HAS KNOWINGLY RELINQUISHED ANY AND ALL OTHER WARRANTIES OF ANY KIND OR NATURE REGARDING THE UNIT AND THE CONDOMINIUM PARCEL.

12. **ESCROW OF DEPOSITS.** Unless an approved alternate assurance arrangement is utilized, all deposits made hereunder shall be held by SunTrust Bank, a Georgia banking corporation, Institutional Asset Services, 777 Brickell Avenue, Second Floor (FL-MIAMI 1020), Miami, Florida 33131 as Escrow Agent, until the expiration of the cancellation period as provided above. Provided Purchaser has not elected to exercise his rights thereunder, Escrow Agent shall further hold all deposits until presentation of an affidavit by Seller to Escrow Agent stating that the cancellation period has expired, construction is complete, and closing has occurred, at which time Escrow Agent shall transfer said deposits to Seller. Interest earned on deposits held in escrow shall be paid to Seller. All notices and claims of Purchaser with respect to the above escrow shall be sent to Escrow Agent at the address set forth above.

13. **MODEL UNITS: CONTINUATION OF SALES PROGRAM.** After the Timeshare Plan is established, Purchaser consents to Seller using one or more Units owned by it as models, to the use of such reasonable signs as may be necessary, to aid Seller in the continuation of its sales program, and to such use of the common elements as may be necessary for Seller to complete its said sales program.

14. **RISK OF LOSS.** Partial loss or damage to said Unit by fire, storm, or other casualty between the date hereof and closing hereunder shall not void or impair this Contract, but all such damage by way of fire, storm, or other casualty is to be the responsibility of Seller. In the event of substantial or total loss prior to closing as a result of the hazards mentioned above, Purchaser shall have the option to cancel this Contract upon written notice to Seller within seven (7) days following Purchaser's notification of such loss or damage.

15. **PURCHASER'S REPRESENTATIONS AND COVENANTS AS TO FOREIGN NATIONAL STATUS.** The United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"), prohibits Seller from engaging, directly or indirectly, in transactions with individuals or entities on OFAC's list, as updated from time to time, of Specially Designated Nationals and Blocked Persons (the "SDN List"). OFAC also administers, from time to time, sanction and embargo programs involving certain designated countries (each an "Embargoed Country").

   a. By signing above, Purchaser represents and warrants to Seller as follows:

      1. Purchaser is not included on the SDN List, and is not owned or controlled by, or acting for or on behalf of, any individual, organization or other entity included on the SDN List.

      2. Purchaser is not a resident or national of any Embargoed Country.

      3. Purchaser is not affiliated with, and does not give support to or receive support from, any terrorist, terrorist organization, narcotics trafficker or person engaged in activities related to the proliferation of weapons of mass destruction.

      4. Purchaser is not an individual, organization or other entity with whom Seller or its affiliates are prohibited from transacting business, or with whom they may transact business only subject to the imposition of significant fines or penalties.

      5. Purchaser hereby represents its compliance with all applicable anti-money laundering laws, including, without limitation, the USA Patriot Act, and the laws administered by OFAC, including, without limitation, Executive Order 13224.

      6. None of Purchaser's employees, directors, officers, or others with a controlling interest in Purchaser, nor any of its affiliates or the funding sources of either is on the SDN List.

      7. Neither Purchaser nor any of its affiliates is directly or indirectly controlled by the government of any country or person that is subject to an embargo by the United States government that prohibits Seller from conducting the business activities contemplated by this Contract with Purchaser.

      8. Neither Purchaser nor any of its affiliates is acting on behalf of an Embargoed Country.

Purchaser agrees that it will notify Seller in writing immediately upon the occurrence of any event which would render the foregoing representations and warranties of

16. **SEVERABILITY.** If any portion of this Contract is held to be invalid or unenforceable for any reason whatsoever, all other provisions of this Contract shall, nevertheless, continue in full force and effect.

17. **GOVERNING LAW; VENUE.** This Contract shall be governed by Florida law. Venue shall be in Palm Beach County, Florida.

18. **MANAGEMENT.** There is a Management Agreement between Marriott Resorts Hospitality Corporation and the Association for the management, maintenance and operation of the Condominium Property, which has an initial term of three (3) years, which agreement shall be automatically renewed for successive three-year periods until or unless terminated. The parties to said Management Agreement have the ability under certain conditions set forth in the Declaration, Bylaws or Management Agreement to make operational decisions which could result in an increase in maintenance fees.

19. **RADON GAS.** Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit.

20. **FLORIDA BUILDING ENERGY-EFFICIENCY RATING ACT.** Pursuant to the Florida Building Energy-Efficiency Rating Act, Part XI, Chapter 553, Florida Statutes, Purchaser may have the energy-efficiency rating of the Unit subject to this Contract determined. The cost for obtaining this rating is the responsibility of Purchaser. By execution of this Contract, Purchaser acknowledges receipt of the Department of Community Affairs' information brochure regarding Florida's Energy-Efficiency Rating System.

21. **INSULATION.** Pursuant to the Federal Trade Commission's Trade Regulation Rule on Labeling and Advertising of Home Insulation (16 C.F.R., Part 460), set forth below is information planned for Units in the Condominium:

| LOCATION | TYPE | THICKNESS | VALUE |
|---|---|---|---|
| Corridor Walls | Metal studs with gypsum board | 5 1/8" thick | ste value of 54 |
| End Walls | Concrete masonry unit wall with stud furring with ridge board | 9 7/8" thick | min r-11 |
| Common/Party Walls | Metal studs with gypsum board | 9 ¼" thick | ste value of 54 |
| Roof | Concrete slab with ridged insulation | 12" concrete slab + insulation (varies) | min r-19 |

22. **CONSTRUCTION DEFECT CLAIMS.** CHAPTER 558, FLORIDA STATUTES, CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY BRING ANY LEGAL ACTION FOR AN ALLEGED CONSTRUCTION DEFECT. SIXTY (60) DAYS BEFORE YOU BRING ANY LEGAL ACTION, YOU MUST DELIVER TO THE OTHER PARTY TO THIS CONTRACT A WRITTEN NOTICE, REFERRING TO CHAPTER 558, OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE AND PROVIDE SUCH PERSON THE OPPORTUNITY TO INSPECT THE ALLEGED CONSTRUCTION DEFECTS AND TO CONSIDER MAKING AN OFFER TO REPAIR OR PAY FOR THE ALLEGED CONSTRUCTION DEFECTS. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER WHICH MAY BE MADE. THERE ARE STRICT DEADLINES AND PROCEDURES UNDER THIS FLORIDA LAW WHICH MUST BE MET AND FOLLOWED TO PROTECT YOUR INTERESTS.

23. **COMMON FURNISHINGS.** In accordance with Paragraph 1 hereinabove, Common Furnishings are the furniture, appliances and equipment which are contained in Units for the benefit and use of Owners, guests, renters and other authorized users of the accommodations and facilities under the Timeshare Plan. Common Furnishings in each Unit(s) shall have a value at least comparable to that contained in the model Units (if any); provided, however, that the Common Furnishings in each Unit need not be identical to those contained in the models.

**For the purpose of ad valorem assessment, taxation and special assessments, the managing entity will be considered the taxpayer as your agent pursuant to Section 192.037, Florida Statutes.**



SPECIAL WARRANTY DEED

THIS SPECIAL WARRANTY DEED, made on this _____, by and between, MARRIOTT OWNERSHIP RESORTS, INC. , a Delaware corporation, (hereinafter referred to as "Grantor"), whose address is 6649 Westwood Boulevard – Suite #500, Orlando, FL 32821-6090 and MICHAEL C. MCINTYRE AND CAROL G. MCINTYRE, Tenants by Entireties (hereinafter referred to as "Grantee"), whose address is c/o Marriott Resorts Hospitality Corporation, 6649 Westwood Boulevard – Suite #500, Orlando, FL 32821-6090.

WITNESSETH:

That the Grantor, in consideration of Ten and No/100 Dollars ($10), and other good and valuable consideration to it, paid by the Grantee, the receipt of which is acknowledged, has granted, bargained and sold, and does grant, bargain, and sell unto the Grantee, its heirs, devisees, successors and assigns forever, the following described timeshare estate(s) from 10:00 a.m. of the first day until 10:00 a.m. on the last day assigned to Grantee during the below described timeshare period(s) as said timeshare period(s) is numbered and defined in the Declaration of Condominium recorded in Public Records of Palm Beach County, Florida, in the Book and at the Page Number hereafter described below, which estate is to be succeeded by a succession of other estates in consecutive and chronological order, revolving among the other timeshare periods described in the Declaration of Condominium, in order annually or biennially, as the case may be, it being the intent of this instrument that each timeshare period shall be considered a separate estate held separately and independently by the respective owners for and during the period of time assigned to each in the Declaration of Condominium, each estate being succeeded by the next in unending succession governed by the Declaration of Condominium until 10:00 a.m. on Day 1 of Unit Week 1 (as described in the Declaration of Condominium) in 2069, at which date said estate shall terminate unless extended in accordance with the provisions of the Declaration of Condominium;

TOGETHER with a remainder over in fee simple absolute, as tenant in common with the other owners of all the timeshare estates in the hereafter described condominium parcel in that percentage interest determined and established by the Declaration of Condominium for the following described real estate located in Palm Beach County, State of Florida, together with an undivided interest in the common elements and limited common elements appurtenant thereto, as follows:

Season: Platinum, Unit No. 1122, Unit Week: 04, View Type: OCEAN VIEW;

in Oceana Palms Condominium, according to the Declaration of Condominium thereof, as recorded in Official Records Book _22467_ at Page _175_ in the Public Records of Palm Beach County, Florida, and any amendments thereof.

This conveyance is subject to and by accepting this deed Grantee agrees to assume the following:
1.   Taxes for the current year and subsequent years.
2.   Declaration of Condominium of Oceana Palms Condominium, and Exhibits attached thereto, and any amendments thereof.
3.   Conditions, restrictions, limitations, reservations, easements, and other matters of record.

The benefits and obligations hereunder shall inure to and be binding upon the heirs, executors, administrators, successors and assigns of the respective parties hereto. The Grantor fully warrants the title to said land, and will defend the same against the lawful claims of all persons claiming by, through or under said Grantor.

IN WITNESS WHEREOF, MARRIOTT OWNERSHIP RESORTS, INC. has caused these presents to be signed in its name by its proper officer on the date first written above.

WITNESSES:

MARRIOTT OWNERSHIP RESORTS, INC.

(Print Name): _____

By: _____

(Print Name): _____

Name: _____
Title: Manager, New Owner Administration
P.O. Box 24747
Lakeland, Florida 33802
(Corporate Seal)

STATE OF _____ )

COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ by _____ of MARRIOTT OWNERSHIP RESORTS, INC., a Delaware corporation, on behalf of the corporation by authority of a corporate resolution recorded in the Public Records of Palm Beach County, Florida. She/he is personally known to me.

(Print Name):_____
Notary Public, State of Florida
Commission No:_____
Commission Expires:_____

Prepared By and Return to:     Linda S. Sellars
Marriott Resorts Title Company
P.O. Box 24747
Lakeland, FL 33802